# UNITED STATES BANKRUPTCY COURT

# FOR THE

# DISTRICT OF VERMONT

| | | |
|---|---|---|
| In Re: | ) | Case No.: 10-11086 cab |
| | ) | |
| UTILITY RISK MANAGEMENT CORP, LLC, | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |

## EMERGENCY MOTION FOR RELIEF FROM STAY, OR IN THE ALTERNATIVE, FOR ADEQUATE PROTECTION

Asplundh Tree Expert Co. ("ATE") and ArborMetrics Solutions, Inc. ("AMI")(collectively "Movants"), through their undersigned counsel, hereby move for an immediate Order modifying the automatic stay to permit them to proceed with state law actions to recover possession of the personal property and loan collateral described below, on grounds (i) that cause for such relief under 11 U.S.C. § 362(d)(1) exists, and (ii) alternatively, that the debtor has no equity in the property, which is not necessary to an effective reorganization. 11 U.S.C. § 362(d)(2).[1] In addition, Movants seek an Order requiring that they be provided adequate protection of their interests in the property that is the subject of this Motion, as described below, whether or not the Court permits their state law actions to go forward at this time. In support of this Motion, ATE submits a Declaration of its officer Larry Moore (and Exhibits), its secured Proof of Claim, and states as follows:

---

[1] This Court has jurisdiction to grant a modification to the automatic stay pursuant to 28 U.S.C. §1334 and 157(g), Bankruptcy Rules 4001 and 9014, Local Rule 9075-1, and 11 U.S.C. §362(d)(1) and (d)(2).

**The Parties**

1. ATE is a Pennsylvania corporation with offices located in Willow Grove, Pennsylvania. ATE is both the Debtor's largest secured lender as well as (through its subsidiary AMI) the Debtor's primary customer, and the holder of 10% of the equity in the Debtor. The other 90% of the company is owned by Adam Rousselle, the Debtor's founder and President. ATE holds a perfected first security interest in all personal property of the Debtor, securing indebtedness of approximately $4.5 million, as described more fully below. L. Moore Declaration, ¶ 1.

2. ATE is a nationwide provider of, among other things, vegetation management services to regulated electric utilities involved in the production and transmission of electricity. ATE provides many of these services through its subsidiary AMI, which provides a comprehensive utility vegetation management program for its utility customers. AMI was the debtor's largest customer for the last several years, providing approximately 95% of its revenues. Id., ¶ 2.

3. Debtor Utility Risk Management Corporation, LLC ("URMC") is a Delaware limited liability company with its principal office located in Stowe, Vermont. On August 17, 2010 ("Petition Date"), the Debtor filed its Ch.11 petition in this Court, and an Order for Relief was entered.

4. URMC has developed or has the rights to an electronic vegetation management solution that provides software and tools to manage and analyze data and provide reporting to AMI's utility customers concerning vegetation risks to their electric transmission lines. AMI's

utility customers in many cases rely on the services it provides to comply with critical regulatory requirements concerning reliability and safety. Id., ¶ 4.

### The Debtor's Business Relationship With ATE and AMI

5.  Until July 29, 2010, URMC was an independent contractor engaged by AMI to provide certain services that are a component of AMI's comprehensive utility vegetation management program. AMI has contracts with utility customers to perform specified aerial monitoring and data gathering concerning specified electrical transmission assets, on a set schedule, and reporting concerning the condition of vegetation risks to those assets. Those customers include:

- BGE, a Constellation Energy Company serving the Baltimore, MD area.
- Dominion, which serves Virginia, North Carolina, Ohio & West Virginia.
- NSTAR, serving Eastern and Central Massachusetts.
- PECO, an Exelon Company serving Southeastern Pennsylvania.

The services URMC had agreed to provide under its subcontract with AMI were necessary to the fulfillment of AMI's prime contracts with its utility customers. The terms of the agreement between AMI and URMC for the provision of services by URMC with respect to these customers were set forth in a Master Services Agreement dated December 7, 2007, as amended. Id., ¶ 5.

6.  For the reasons outlined below, AMI terminated the Master Services Agreement on July 29, 2010.

7.  ATE is the Debtor's single and largest secured creditor. To facilitate URMC's ability to perform its contracts with AMI, ATE provided certain term and revolving working capital financing to URMC. In particular, on or about November 12, 2008, URMC executed and

Downs
Rachlin
Martin PLLC

3

delivered to ATE a Loan and Security Agreement ("Loan and Security Agreement") pertaining to two loans: a revolving line of credit loan in the amount of $3,500,000, and a term loan in the amount of $1,500,000. Id., ¶ 7. A true copy of the Loan and Security Agreement is attached to the Moore Declaration as Exhibit 1. The two promissory notes (a Revolving Credit Note ("LOC Note") and a Term Note ("Term Note")) evidencing these loans are attached to the Moore Declaration as Exhibits 2 and 3.

8. To secure repayment of amounts borrowed under the Loan and Security Agreement, and all other obligations of the URMC to ATE, URMC granted to ATE a first priority security interest in all of its personal property, including but not limited to inventory including work in process, accounts, instruments including notes, equipment including vehicles, general intangibles, investment property, chattel paper, cash and cash equivalents, documents, fixtures, books and records, whether written, electronic or other media, and computer hardware and software and the proceeds of same (collectively the "Collateral").

9. ATE perfected its security interest in the Collateral by filing a UCC Financing Statement with the Delaware Secretary of State, on or about November 17, 2008. A true copy of the filed UCC Financing Statement #2008 3926357 is attached to the Moore Declaration as Exhibit 4.

10. As of the Petition Date, ATE was owed the principal amount of $ 2,986,761, plus interest of $10,601.75, for a total of 2,997,362.75 on the LOC Note. As of the Petition Date, ATE was owed the principal amount of $1,494,421, plus interest of $6,226.80, for a total of $1,500,647.80 on the Term Note. These amounts are exclusive of costs and legal expenses payable under the notes. Id., ¶ 10. ATE's secured Proof of Claim in these amounts has been filed, is attached as an Exhibit to this Motion, and is incorporated herein by reference.

11.     Under the Loan and Security Agreement, URMC had a $3.5 million revolving line of credit from ATE that was to be used to assist it with periodic cash flow needs solely in the performance of the MSA.  URMC had the ability to borrow up to 75% of the amount of purchase orders issued to it by AMI, so it could pay expenses incurred in the performance of services for AMI's customers, before payment from customers was due.  These expenses included payments to vendors providing data gathering services and critical information processing services used to create the end products for utility customers.  URMC's agreements with ATE provide that upon payment by the utility customer to AMI for work against which funds had been advanced by ATE, AMI will first receive its agreed commission, then all interest accrued and outstanding principal of any advance was to be repaid to ATE, with any balance going to Debtor.  Id., ¶ 11.

12.     As part of the business and lending relationship established among the Debtor, ATE, and AMI in November, 2008, ATE acquired a 10% ownership interest in the Debtor. Id., ¶ 12.

**Breach of Loan Agreement and Termination of Master Services Agreement**

13.     Despite drawing large advances on its line of credit from ATE in 2010 as permitted by the Loan and Security Agreement to pay vendors and other costs related to ongoing jobs for utility customers, many of the Debtor's vendors have not been paid.  Although the Debtor has not yet filed any Schedules, ATE believes the critical subcontractors that have provided services on outstanding customer jobs, against which the Debtor obtained loan advances, are owed approximately $1 million.  On two of the larger pending contracts (with Dominion and BGE), ATE advanced to the Debtor approximately $2.0 million on its revolving loan, which should have been used to pay expenses associated with these contracts.  But

according to the Debtor's records, the projects are 0% complete at this time. Both contracts involve use of a helicopter service to fly transmission lines and gather data concerning vegetation growth. Flights for the Dominion contract have already been delayed close to three weeks beyond schedule, and no progress can be made until the raw data is gathered. The Debtor does not have the funds to pay for this work, or for work to process the data, nor for the helicopter and other services that are required for the BGE contract against which it has borrowed. The $2.0 million appears to have been used by the Debtor for other purposes.

14. Based on the Debtor's failure to pay its subcontractors, its failure to explain the non-payment, and its failure to provide any reasonable assurances concerning its ability to pay subcontractors and continue to perform under the MSA, AMI terminated the MSA by written notice to the Debtor dated July29, 2010, as permitted by the MSA. Id., ¶ 14.

15. ATE believes that the primary sources of the Debtor's financial distress are mismanagement and excessive compensation and distributions paid to its President and 90% owner, Adam Rousselle. ATE believes that Adam Rousselle has received compensation and benefits from the Debtor over the last eighteen months exceeding $1.9 million, despite the facts that the URMC Operating Agreement and the Loan and Security Agreement limit the compensation that can be paid to Rousselle to $200,000 per year, and that URMc was operating at a loss. Id., ¶ 15.

16. As a result of multiple events of default as defined in the Loan and Security Agreement, ATE exercised its rights to bring a state court action for replevin in the Lamoille Superior Court. That action was filed on August 17, 2020, prior to the filing of the Debtor's Ch. 11 petition. On the same day, before receiving notice of the Debtor's Ch. 11 filing, AMI filed in the Court of Common Pleas for Montgomery County Pennsylvania an action against URMC for

breach of contract under the MSA, and to recover possession of the data relating to past and future work done under the MSA, now held by URMC, but owned by AMI. Id. ¶16.

17. Under the terminated MSA, AMI is the owner of all data and other deliverables set forth in any statement of work or purchase order issued by it under the MSA. The Debtor is in possession of large amounts of data and other information gathered in connection with prior completed customer jobs and jobs in progress, including data concerning existing vegetation risks to AMI customer assets that were in the process of being assessed at the time of Debtor's bankruptcy filing. On information and belief, the Debtor has not "backed up" this data or duplicated the data and stored it in any separate, secure location, but houses the data on its computer systems. Loss of this data could result in a breach by AMI under its contracts with its customers that require data retention, and jeopardize AMI's ability to fulfill pending contracts, leaving customer power transmission assets at risk of damage and those customers at risk of regulatory violations. Id., ¶ 17.

**Irreparable Injury to ATE and AMI**

18. The Debtor's defaults under the MSA and the Loan and Security Agreement have had a profound negative impact on ATE and AMI's business, and threaten further irreparable harm to ATE, AMI and their utility customers. The services URMC agreed to provide under its subcontract with AMI were necessary to the fulfillment of AMI's prime contracts with its utility customers. URMC's non-payment of subcontractors has in turn caused those subcontractors to cease doing essential work on the outstanding contracts with AMI's customers listed above. For example, URMC's failure to pay subcontractors used to gather aerial data on vegetation threats has already resulted in substantial delays in work that impair AMI's ability to deliver required services on the schedule agreed with its utility customers. URMC also lacks the funds to pay its

DOWNS
RACHLIN
MARTIN PLLC

7 

employees to perform the necessary data analysis and related work, as its own cash collateral budget shows minimal cash on hand as of the Petition Date ($12,831).  In order for AMI to be able to fulfill its contracts with utilities, and avoid further damage to its customer relationships, AMI must have access to the computer hardware and software used by URMC to analyze and process the aerial data that has already been gathered.  The data itself is the property of AMI under the MSA.  URMC's computer hardware and software was pledged as security for the Term Note and LOC Note, so that ATE could have recourse to these essential assets if URMC were to default.  In addition, AMI must have access to the technology licenses and rights used by URMC to perform its work, which are part of the collateral pledged for the ATE loans.  Id., ¶ 18.

19. Unless ATE and AMI can obtain immediate relief from this Court and recourse to the collateral for the ATE loans, immediate and irreparable harm may result.  URMC's defaults have already delayed necessary data gathering work for several weeks.  Delay in data gathering results in delay of delivery of reports to utility customers, and delay in work necessary to address existing vegetation threats to power transmission assets.  Failure to timely report existing vegetation threats to utilities could result in damage to transmission lines and power outages. AMI's customers rely on the timely performance of AMI's services to comply with regulatory requirements concerning reliability.  URMC's defaults and delays could result in regulatory violations and fines absent immediate relief permitting the work that needs to be done to go forward.  URMC's defaults and delays could also irreparably harm AMI's relationships with its customers, leaving AMI with no effective relief for such injury because of URMC's insolvency and lack of any equity in its assets.  Id., ¶ 19.

**Lack of Equity**

20. According to the Debtor's books and records, the book value of its assets (less leasehold improvements that would revert to its landlord), is no more than $3,120,332. Id., ¶ 20. (A copy of the Debtor's asset schedule as of august 4, 2010, is attached to the Moore Declaration as Exhibit 5.) This is $1.4 million less than the secured debt owed to ATE.

21. By definition, the Debtor can have no equity in the data and other information that is the property of ATI under the terminated MSA.

### Lack of Feasible Reorganization

22. The Debtor's business depended almost entirely on its MSA with AMI, which was effectively terminated under state law weeks before its bankruptcy filing. The Debtor has little or no cash, and submitted a cash collateral budget that assumes no further revenues from AMI under the MSA, but instead is predicated solely on projected future revenues from a few small contracts the Debtor has independent of the MSA, and other contracts that do not presently exist. It appears from the cash collateral operating budget that 80% or more of the Debtor's projected September 2010 revenues will come from new contracts its does not now have, and that 100% of projected October and November revenues will come from new contracts. The Debtor's budget projects that it will collect approximately $300,000[2] in the next few weeks on miscellaneous open contracts independent of the MSA, with all other projected revenues to come from new contracts.

23. Just to complete the two largest pending open jobs under the terminated MSA (Dominion and BGE), the Debtor would need no less than $1.7 million. The terminated MSA provides for a winding up process if it is terminated, but it is clear that the Debtor lacks the

---

[2] One of the revenue sources listed in the Debtor's budget is "HQ," which is believed to be HydroQuebec, from which the Debtor projects it will collect approximately $200,000 in September. AMI believes there may be significant collection issues with this receivable, as URMC has no Canadian affiliate that is positioned to accept this payment, and URMC may not be qualified to do business in Quebec.

9

financial resources to complete pending jobs as part of any wind-up.[3] Movants have no choice but to complete those jobs at their own expense, even though ATE is already owed some $1.5 million[4] for funds already advanced against those jobs. This may increase the claim Movants have against the Debtor, in the amount that will need to be paid on the Debtor's behalf to complete its work, less future payments from customers. Id., ¶ 23.

### Cause for Relief From Stay

24. "Cause" for relief from the automatic stay exists in this case because continuation of the stay will result in irreparable harm to ATE and AMI, whereas relief from stay will simply result in the inevitable liquidation of the Debtor's business. The test the Court should apply in this context is a balance of hardships test, weighing the hardship to the Movants from imposition of the stay against the potential prejudice to the debtor, the estate, and other creditors. In re Loudon, 284 B.R. 106, 109 (B.A.P. 8th Cir. 2002). If the movant makes a prima facie showing of cause for relief from stay, the burden shifts to the party opposing to show that justification for continuation of the stay exists. In re Paxson Elec. Co., 242 B.R. 67, 70 (Bankr. M.D. Fla. 1999).

25. The facts set forth herein establish a prima facie case of "cause" for relief from stay. The Debtor was in dire financial condition before its bankruptcy filing, and remains so. The Debtor cannot pay the approximately $1 million it owes to essential subcontractors on pending jobs under the MSA, nor does it have any demonstrable source of funding for the minimum of $1.7 million of additional funding it would need to complete the work on pending projects under the MSA. AMI is forced to complete the work that the Debtor cannot perform, to avoid the risk of breaching its contracts with its customers, and placing those utility customers at

---

[3] On August 20, 2010, the Debtor notified AMI in writing that it was suspending work on projects pending under the terminated MSA, presumably for lack of funds to do the work.

[4] The amount owed is approximately $1.5 million on the loan advances in the amount of $2.0 million because one customer has made an advance payment for work that URMC has not done and has no ability to do.

DOWNS RACHLIN MARTIN PLLC

10

risk for regulatory violations and fines, and possible power outages. Yet AMI cannot effectively perform that work and mitigate its losses without access to customer data that has been gathered by Debtor, and the software tools in the Debtor's possession used to analyze the data and put it into useful form for customers.

26. To avoid relief from stay, the Debtor must establish the objective viability of its reorganization. In a case like this, the feasibility inquiry under both subsections (1) and (2) of Section 362(d) is essentially the same. "Cause" for relief from stay will be established under subsection (1) if the Debtor cannot establish the objective feasibility of its reorganization, In re: R&G Properties, Inc. 2009 WL 1076703, at *5 (Bankr. D.Vt. 2008), and relief is required under subsection (2) unless the Debtor can establish that the property is "necessary for an effective reorganization." There should be no dispute over the Debtor's lack of equity in the property, given the large gap between the secured debt to ATE and the book value of the available assets. In determining the existence of equity in the property, the focus must be the fair market value of the assets, not the going concern value of the Debtor's business, whatever that may be. The language of Section 362(d)(2) is focused on whether the debtor has "an equity in such property." Given the language of the statute, the fair market value of the assets in question is what must be determined for relief from stay purposes. In re: Markowitz Building Co., 84 B.R. 484, 487 (Bankr. N.D. Ohio 1988). The book value of the assets carried on Debtor's books can be used by the Court as a proxy for the high-end of fair market value. Although Movants have not had the opportunity to obtain an appraisal of the assets, and reserve the right to do so and offer other evidence concerning valuation of the assets if necessary, for purposes of this Motion, the Court should find there is no equity.

DOWNS
RACHLIN
MARTIN PLLC

11

27. Even if there were equity in the assets, relief from stay must be granted unless the Debtor can establish the feasibility of its reorganization, or cause for relief from stay exists. This requires a demonstration by the Debtor that there is a "reasonable possibility of a successful reorganization within a reasonable time." United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assoc., 484 U.S. 365, 370 (1988).

28. To avoid a finding that its Ch. 11 filing was the "last gasp of a dying enterprise," In re: RCM Global Long Term Capital Appreciation Fund, Ltd., 200 B.R. 514, 519 (Bankr. S.D.N.Y. 1996), the Debtor must show some indicia of a viable enterprise. Current business and cash flow are essential to this showing. The Debtor's own cash collateral filings indicate it has no current business on the books beyond the estimated $300,000 in revenues its expects over the next month, a substantial portion of which may be subject to collection problems. These revenues, even if they are all collected, fall far short of what the Debtor would need to complete performance of the open jobs under the terminated MSA. For reasons unclear to Movants, the Debtor has already spent the $2.0 million in loan advances taken against the contracts that were in progress when the MSA was terminated, failed to pay essential subcontractors on those projects pre-petition, and now lacks the funding to continue with work. With no line of credit from ATE, and no other available source of financing, the Debtor cannot remain in business. Having lost the source of 95% of its revenue, the Debtor is not in a position to show that its business is viable based on the 5% of its revenue independent of AMI, and its hope to generate more business.

### Adequate Protection

29. If relief from stay is not granted immediately, ATE is at a minimum entitled to adequate protection of its interest in the Collateral, which includes receivables from utility

customers that may be jeopardized if it is prevented from recourse to its collateral so it can complete work for those customers under partially completed contracts. AMI currently has approximately $609,000 in open billings to customers on contracts opened under the MSA, but not yet completed. Moore Declaration, ¶24. These receivables may be lost or their value compromised if the contracts between AMI and these customers are not timely and adequately performed.

30. Even if the Court does not grant relief from stay immediately, it must as a condition to denying relief allow ATE and AMI the right to have access to and use URMC's software tools and other information necessary to allow them to complete the work that the Debtor cannot complete. This would entail giving AMI a copy of data already gathered for customers, any work in process on open projects, and a limited right to use ATE's other collateral (including software and computer hardware) to complete necessary work on projects. This could be done without inflicting any damage on the Debtor's existing business. Without this relief, AMI is effectively coerced into making a post-petition loan to the Debtor for which there effectively is no collateral, as it would have to pay the subcontractors to which the Debtor is liable, and fund the Debtor's operations in order to complete the work. While the Debtor may contend the additional funding would generate additional revenues that would pay down the ATE line of credit, that would not necessarily provide adequate protection of ATE's interest in the Collateral. It is incumbent on the Debtor to show that such a scenario would not result in a greater losses to ATE, which already faces a large potential deficiency. ATE does not believe the Debtor can make such a showing.

31. ATE is not aware of any other claimed liens on the Collateral.

32. In the event the Court grants relief from the automatic stay pursuant to this Motion, ATE asks the 14 day stay provision contained in Federal Rule of Bankruptcy Procedure 4001(a)(3) be waived.

WHEREFORE, Movants pray that:

1) The Court modify the automatic stay to permit ATE and AMI to exercise their state law remedies with respect to the property described herein;

2) In the alternative, that the Court order Debtor to provide adequate protection to Movants with respect to the property, including, without limitation:

a. an Order that the Debtor forthwith provide to AMI and ATE a complete duplicate electronic copy, in a format readable by AMI, of all raw data gathered on completed projects performed under the MSA and predecessor agreements, and copies of all work-product generated by URMC on such projects; and

b. an Order that the Debtor forthwith provide to AMI and ATE a complete duplicate electronic copy, in a format readable by them, of all raw data gathered for pending, incomplete projects under the MSA, and all work in process related to such projects; and

c. an Order that the Debtor cooperate with AMI and ATE to give them access to and the right to use all software owned by or licensed to Debtor and used in the performance of pending, incomplete projects under the MSA, solely for the purpose of completion of said projects, and subject to the confidentiality and non-disclosure provisions of the MSA; and

d. an Order that AMI and ATE have the right to make direct agreements with existing subcontractors for pending, incomplete projects under the MSA, notwithstanding any restrictions in agreements between the Debtor and those subcontractors on the right of subcontractors to enter into such agreements; and

e. an Order granting such other and further relief as is necessary to allow ATE and AMI to protect the value of the receivables due from utility customers on pending, incomplete projects under the MSA, by finishing the work the Debtor is unable to perform given its financial condition.

3) The 14 day stay period provided in Federal Rule of Bankruptcy Procedure 4001(a)(3) be waived if the Court orders modification of the stay as prayed for herein, and

4) The Court grant such other and further relief as may be proper.

Burlington, Vermont August 21, 2010

DOWNS RACHLIN MARTIN, PLLC

By: /s/ Andre D. Bouffard
Andre D. Bouffard
Attorneys for Asplundh Tree Expert Co.
199 Main Street
P.O. Box 190
Burlington, VT 05402
(802) 863-2375

3839431.1

DOWNS
RACHLIN
MARTIN PLLC

15