**UNITED STATES BANKRUPTCY COURT**

**FOR THE**

**DISTRICT OF VERMONT**

| | | |
|---|---|---|
| In Re: | ) | Case No.: 10-11086 cab |
| | ) | |
| UTILITY RISK MANAGEMENT CORP, LLC, | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |

## AMENDED INTERIM STIPULATION REGARDING RELIEF FROM STAY, CASH COLLATERAL, AND ADEQUATE PROTECTION

This Stipulation and Agreement is by and among Asplundh Tree Expert Co. ("ATE"), ArborMetrics Solutions, Inc. ("AMI"), and Debtor in Possession Utility Risk Management Corporation, LLC ("URMC"), each of which has authorized their undersigned counsel to execute this Interim Stipulation for the purpose of memorializing their agreements to resolve, on an interim basis, the following pending Motions: URMC's Motion for Authority to Use Cash Collateral dated August 17, 2010 ("Initial Cash Collateral Motion"); URMC's Emergency, Supplemental Motion for Authority to Use Cash Collateral, dated August 23, 2010 ("Supplemental Cash Collateral Motion"), and ATE/AMI's Emergency Motion for Relief From Stay and/or Adequate Protection, dated August 21, 2010 ("Relief From Stay Motion").

### Recitals

1. Until July 29, 2010, URMC was an independent contractor engaged by AMI to provide certain services that are a component of AMI's comprehensive utility vegetation management program. AMI has contracts with utility customers to perform specified aerial

monitoring and data gathering concerning specified electrical transmission assets, on a set schedule, and reporting concerning the condition of vegetation risks to those assets. Those customers include:

- BGE, a Constellation Energy Company serving the Baltimore, MD area.
- Dominion, which serves Virginia, North Carolina, Ohio & West Virginia.
- NSTAR, serving Eastern and Central Massachusetts.
- PECO, an Exelon Company serving Southeastern Pennsylvania.

The services URMC had agreed to provide under its subcontract with AMI were necessary to the fulfillment of AMI's prime contracts with its utility customers. The terms of the agreement between AMI and URMC for the provision of services by URMC with respect to these customers were set forth in a Master Services Agreement dated December 7, 2007, as amended.

2. On July 29, 2010, AMI purported to terminate the Master Services Agreement("MSA") for cause. The parties reserve all of their rights respecting the purported termination of the MSA. With respect to URMC subcontracts that were in process at the time of the termination of the MSA, as listed on Exhibits A and B, the parties have been operating under the wind-up provisions of the MSA since it was terminated.

3. ATE is URMC's single and largest secured creditor. To facilitate URMC's ability to perform its contracts with AMI, ATE provided certain term and revolving working capital financing to URMC. In particular, on or about November 12, 2008, URMC executed and delivered to ATE a Loan and Security Agreement ("Loan and Security Agreement") pertaining to two loans: a revolving line of credit loan in the amount of $3,500,000, and a term loan in the amount of $1,500,000.

4. To secure repayment of amounts borrowed under the Loan and Security Agreement, and all other obligations of the URMC to ATE, URMC granted to ATE a lien on that personal property as described in the Loan and Security Agreement and related UCC Financing Statement filed by ATE (collectively the "Collateral").

5. ATE filed a UCC Financing Statement with the Delaware Secretary of State, on or about November 17, 2008, with regard to the Collateral.

6. ATE has filed a secured proof of claim in the total amount of $4,498,010.50, plus legal expenses and costs.

7. URMC has failed to and is unable to perform the contracts listed on Exhibit A ("Released Contracts"), but wishes to continue to work on the contracts listed on Exhibit B, which are known as the NSTAR contract and the BGE DLCP contract (hereinafter "Reserved Contracts").

8. Under the MSA, AMI is the owner of all data and other deliverables set forth in any statement of work or purchase order issued by it under the MSA. URMC is in possession of large amounts of data and other information gathered or provided to it in connection with prior completed customer jobs and jobs in progress, including data concerning existing vegetation risks to AMI customer assets that were in the process of being assessed at the time of Debtor's bankruptcy filing.

9. The Initial Cash Collateral Motion, Supplemental Cash Collateral Motion, and Relief From Stay Motions are currently set for hearing on August 31, 2010.

**<u>Agreement</u>**

WHEREFORE, based on the foregoing, the parties agree as follows:

A. For the purposes of this Agreement and the stipulation contained herein, the parties agree and acknowledge that the foregoing recitals are true and correct and are hereby incorporated into and made a part of this Agreement.

B. ATE and AMI consent to use of cash collateral by URMC as set forth in its Initial Cash Collateral Motion, and the budget attached to that Motion, on all the terms and conditions for said use set forth in said Motion, for a period of time ending September 30, 2010. For the avoidance of any doubt, the use of cash collateral shall be limited to proceeds of receivables paid or payable by customers of URMC other than AMI for work done outside the scope of the MSA. URMC hereby withdraws its Supplemental Cash Collateral Motion, without prejudice to any of its rights or claims set forth therein.

C. As adequate protection, URMC agrees as follows and (to the extent necessary), the Court may order :

    (i) URMC will immediately provide to AMI a complete duplicate electronic copy, in a format readable by AMI, of all deliverables and related data gathered or used by URMC in connection with its work on completed projects performed by URMC as a subcontractor to AMI.

    (ii) URMC will immediately provide to AMI a complete duplicate electronic copy, in a format readable by them, of all data gathered by or provided to URMC for pending, incomplete projects listed on Exhibits A and B, provided that AMI covenants not disclose such data for the Reserved Projects to any third party

without the consent of URMC, or pursuant to court order permitting such disclosure.

(iii) AMI and ATE shall be free to make direct agreements with any existing subcontractors or vendors for all pending, incomplete projects under the MSA, notwithstanding any restrictions in agreements between URMC and those subcontractors and/or vendors restricting their right to enter into such agreements; and shall be free to engage any existing or new subcontractor or vendor it may need to complete the customer work on the Released Contracts; <u>provided</u> (i) that AMI and ATE agree not to engage GeoDigitial International, Inc. to work in any capacity on said contracts until after August 31, 2010, and (ii) that AMI and ATE agree not to engage any new subcontractor or vendor they may need to complete customer work on the Reserved Contracts so long as URMC continues to perform satisfactorily under the scope of work agreed with those customers; and <u>provided further</u> that URMC agrees and acknowledges that no existing subcontractor or vendors with a claim against it shall waive or impair its claim by entering into a new contract with AMI. AMI agrees that it will not enter into any contracts with current subcontractors or vendors of URMC for completion of work under the agreements listed in Exhibit A that limit the right of such parties to do business with

URMC.

(iv)     URMC grants to AMI the limited right to obtain access to and the right to use all software owned by or licensed to URMC and used in the performance of pending, incomplete projects under the MSA, solely for the purpose of completion of the Released Contracts, and subject to the confidentiality and non-disclosure provisions of the MSA, for a period of time extending until the completion of AMI's prime contracts with the customers on the Released Contracts (BGE and Dominion).  The right and license granted herein shall not extend to any extension or material amendment of such prime contracts, but will extend to contract extensions that may be unilaterally invoked by the customers under the existing contracts.  AMI covenants and agrees that at the expiration of such right, it shall deliver its certificate to URMC certifying that all copies of such software have been returned to URMC or destroyed.   For a period of six (6) months from the date of this Stipulation, AMI will have the right to obtain on reasonable advance notice the services of URMC employees as needed to ensure that service to customers is maintained in accordance with the scope of services agreed with them, at hourly rates customary for such services as to be negotiated be the parties, provided that use of URMC's employees under this provision shall not

Downs Rachlin Martin PLLC

6

unreasonably interfere with the ordinary course of URMC's business. AMI will promptly reimburse URMC for any additional license or other related fees payable by URMC to third parties as a result of the rights granted to AMI pursuant to this subsection (iv) to use URMC's intellectual property to complete projects as permitted by this Agreement.

(v) ATE shall have a replacement lien on all post-petition accounts receivables of URMC, to secure the amount of pre-petition cash and accounts receivable that are subject to the lien of ATE and are consumed by URMC pursuant to this Stipulation.

D. ATE and AMI accept the relief granted herein as a resolution of their Relief From Stay Motion, without prejudice to their right to file such further motions for relief from stay or other relief based on grounds unrelated to failure of URMC to perform its obligations under the contracts listed on Exhibit A up to the date of this Agreement. ATE and AMI reserve their right to file such motion(s) at any time after September 21, 2010, if no binding agreement has been executed by URMC for the sale of its assets by that date, in a form acceptable to ATE and AMI, and the parties reserve all of their rights and defenses with respect to any such Motion.

E. Upon execution of this Stipulation, URMC and AMI will negotiate in good faith and enter into a new subcontract providing for completion of those tasks and services URMC was obligated to perform under open purchase orders related to the NSTAR contract when the

MSA was terminated, solely at the expense of URMC, with no further advances to be made by ATE with respect to that contract. That agreement shall provide for the same billing and payments arrangements for this work as were in place under the MSA prior to its termination, meaning that all amounts billed to and collected by AMI from the customer will first be applied by AMI to pay it a 10% commission, then to repay ATE for all loan advances made against this contract (in the amount of $409,000), plus interest under URMC's revolving credit note to ATE, with the balance payable to URMC. As to the BGE DLCP contract, so long as URMC shall continue to perform in accordance with the terms of this pre-petition contract, that contract (including payment provisions) shall remain in effect in all respects, including those provisions stating that all revenues to which URMC would otherwise be entitled will be applied to reduce the debt owed to ATE arising from advances by ATE with respect to the BGE DLCP contract before any payment to URMC.

  F.  All revenues collected by AMI under pending contracts it will complete shall be distributed as provided under the MSA prior to its termination, provided that before URMC is entitled to any distribution, all additional costs incurred by AMI to complete said contracts since termination of the MSA shall first be reimbursed to AMI before any distribution is made to URMC and provided further that URMC reserves the right to dispute, inter alia, the appropriateness or reasonableness of any such costs or expenses incurred by AMI.

DOWNS
RACHLIN
MARTIN PLLC

8

Burlington, Vermont August 31, 2010

DOWNS RACHLIN MARTIN, PLLC

By: /s/ Andre D. Bouffard
Andre D. Bouffard
Attorneys for Asplundh Tree Expert Co.
199 Main Street
P.O. Box 190
Burlington, VT 05402
(802) 863-2375

Portland, Maine August 31, 2010

DRUMMOND WOODSUM

By: /s/ Benjamin E. Marcus
Benjamin E. Marcus
Attorney for URMC
84 Marginal Way, Suite 600
Portland, Maine 04101-2480
(207) 772-1941, ext. 586

APPROVED AND SO ORDERED:

_____
Colleen A. Brown
Chief United States Bankruptcy Judge

3844665.1
3845769.1
3845783.1~~3845782.1~~